```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                            :
PETER F. SHARKEY and CHARLES LEINBERRY, JR., :
                                                            :
                        Plaintiffs,                         :
                                                            :       20 Civ. 8258 (JPC)
             -v-                                            :
                                                            :       OPINION AND ORDER
ZIMMER USA, INC. doing business as ZIMMER                   :
BIOMET, and ZIMMER KNEE CREATIONS, INC.                     :
                                                            :
                        Defendants.                         :
                                                            :
-----------------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

Plaintiffs Dr. Peter F. Sharkey and Dr. Charles Leinberry sold the rights to their novel surgical invention to Defendants Zimmer USA, Inc. ("Zimmer") and Zimmer Knee Creations, Inc. ("ZKC"). In return, Defendants promised to pay Plaintiffs royalty payments based on a percentage of Defendants' sales of products incorporating this technology. Plaintiffs now allege that Defendants breached the implied covenant of good faith and fair dealing by taking actions that impeded these sales, including by altering their business strategy to focus on competing products and failing to protect confidential information related to Plaintiffs' invention. Plaintiffs also bring a claim of tortious interference with contract in connection with Zimmer's allegedly improper interference with the contractual relationship between ZKC and Plaintiffs.

Defendants now move to dismiss Plaintiffs' claims, arguing primarily that the implied obligations Plaintiffs seek to impose are at odds with the parties' contractual relationship. For reasons explained below, the Court agrees with Defendants and grants their motion to dismiss with prejudice.

# I. Background

## A. Factual Background

The factual allegations recited below are drawn from the Amended Complaint and the exhibits attached to it, including the various contracts relevant to this case. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of this motion, the Court assumes the truth of the well-pleaded factual allegations contained in the Amended Complaint. *See id.*

### 1. Plaintiffs' Invention and the 2008 Agreement

In 2005, Plaintiffs invented a surgical technology known as subchondroplasty ("SCP"), "a minimally-invasive surgical technique using bone marrow implants and related instrumentation for the treatment of osteoarthritis in the knee and other joints." Dkt. 20 ("Am. Compl.") ¶¶ 2-3, 22. In 2008, after filing a patent application covering a substantial part of this technology, Plaintiffs entered into an agreement with non-party Knee Creations, LLC ("Knee Creations"). *Id.* ¶¶ 4-5, 22, 24-25; Dkt. 20, Exh. A ("2008 Agreement").

Pursuant to the 2008 Agreement, Plaintiffs transferred most of their rights in the SCP intellectual property[1] to Knee Creations in return for $100,000 and future royalty and milestone payments.[2] Am. Compl. ¶¶ 25-26; 2008 Agreement ¶¶ 2.2, 3.1, 3.2, 3.3. Specifically, Plaintiffs

---

[1] While the parties' briefs refer to the technology invented by Plaintiffs as "SCP" technology, the 2008 Agreement references this intellectual property as "BML Intellectual Property," with "BML" defined as "bone marrow lesion," and "BML Intellectual Property" as "the Intellectual Property possessed by [Plaintiffs] and related to BML theory and technology." 2008 Agreement ¶¶ 1.2, 1.3. For purposes of clarity, the Court uses the term "SCP" when referring to Plaintiffs' invention.

[2] According to the Amended Complaint, Knee Creations grounded "its entire corporate strategy" on the SCP technology, which was its only product at the time. Am. Compl. ¶¶ 5, 23.

were to receive royalty payments equal to 3% of Knee Creations' annual sales of products incorporating the SCP technology (the "SCP Products"), with each Plaintiff receiving 1.5%, until ten years after net sales of the SCP Products reached annual sales of at least ten million dollars. Am. Compl. ¶ 27; 2008 Agreement ¶ 3.2.  Meanwhile, the 2008 Agreement tied the milestone payments to "specified events," which Knee Creations was obligated to "use its commercially reasonable best efforts to achieve" "as promptly as commercially reasonable after the execution of th[e] [2008 Agreement]."  2008 Agreement ¶ 3.1; *see* Am. Compl. ¶ 26.  These events included: (1) completion of clinical studies related to the SCP technology and subsequent publication of the results; (2) approval by the U.S. Food and Drug Administration of an implant device using the SCP technology;  and (3) the grant of a patent and trademark as to "instruments to be used in conjunction with" the SCP technology.  2008 Agreement ¶ 3.1(a)-(d).  Plaintiffs were to be paid a fixed sum upon completion of each of these milestone events, with certain milestone payments to be offset from future royalty payments.  *Id.*

      Important for the present dispute, Knee Creations agreed in the 2008 Agreement to refrain from "directly or indirectly engag[ing] in research, development or marketing of any product competitive with the [SCP] Intellectual Property, except with the prior approval of [Plaintiffs] which shall not be unreasonably withheld or delayed."  2008 Agreement ¶ 4.2(f); *see* Am. Compl. ¶ 29.  The 2008 Agreement also obligated Knee Creations to "take all commercially reasonable actions to maintain and protect the [SCP intellectual property]" and "take reasonable security measures to protect the confidentiality" of the SCP technology.  2008 Agreement ¶¶ 4.2(a), 4.2(b); *see* Am. Compl. ¶ 28.

### 2. Zimmer's Purchase of Knee Creations and Amendments to the 2008 Agreement

The relationship between Knee Creations and Plaintiffs remained unchanged until 2013, when Zimmer purchased Knee Creations.[3]  Am. Compl. ¶ 37.  To effectuate this acquisition, Zimmer incorporated Knee Creations into a separate entity, Defendant Zimmer Knee Creations, Inc. ("ZKC"), which it employed as its "internal distributing unit."  *Id.*  Zimmer and Plaintiffs also entered into a contract that amended the 2008 Agreement.  *Id.* ¶ 38; Dkt. 20, Exh. B ("2013 Amendment").  The 2013 Amendment assigned to Zimmer the same rights to the SCP technology as owned by Knee Creations under the 2008 Agreement.  *See* 2013 Amendment p. 1.  Zimmer also inherited Knee Creations' obligations under the 2008 Agreement, including the duty to pay Plaintiffs the royalty and milestone payments.  *Id.*  Notably, the 2013 Amendment "deleted, extinguished, and removed in their entirety" Sections 4.2(a) and 4.2(f) of the 2008 Agreement, 2013 Amendment ¶ 1(c), which, as mentioned above, prohibited Knee Creations from engaging in research, development, or marketing of products competing with the SCP technology and required Knee Creations to take commercially reasonable action to protect the SCP intellectual property, 2008 Agreement ¶¶ 4.2(a), 4.2(f).  *See* Am. Compl. ¶ 41.

In 2014, Plaintiffs and ZKC entered into an agreement to clarify royalty payments to Plaintiffs in connection with the sale of SCP Products focused on "joints other than the knee."  Am. Compl. ¶ 43; Dkt. 20, Exh. C ("2014 Amendment"; collectively with the 2008 Agreement and the 2013 Amendment, the "Amended Agreement").[4]  The 2014 Amendment also modified

---

[3] The Amended Complaint alleges that Zimmer's predecessor, Zimmer GmbH, was the entity that purchased Knee Creations, and that Zimmer acquired another company, Biomet, and changed its corporate name to Zimmer Biomet Holdings, Inc. in June 2015.  Am. Compl. ¶¶ 37, 50.  The parties do not argue that this has any legal or factual significance to this motion.

[4] Plaintiffs allege that SCP technology was initially "focused on the knees," but that it was later developed to apply to other joints.  Am. Compl. ¶¶ 3, 21.

4

how the royalty payments would be divided between Plaintiffs. Am. Compl. ¶ 46; 2014 Amendment ¶ 1(b).[5]

### 3. Increased Sales of the SCP Products and Zimmer's 2017 Changed Business Strategy

From 2008 to 2013, net sales of knee-related SCP Products gradually increased, reaching approximately five million dollars by 2013. Am. Compl. ¶ 33. In 2013, Zimmer's President, David Dvorak, told Plaintiffs "that Zimmer would strongly support the sales growth of [the SCP] Products through surgeon and sales force education, direct-to-consumer marketing and value-added commissions to representatives for sales of [the SCP] Products." *Id.* ¶¶ 48-49. Plaintiffs allege that Defendants followed through with Dvorak's assurance and sales continued to rise, reaching $13.6 million in 2014, $23 million in 2015, $35 million in 2016, and $38 million in 2017. *Id.* ¶¶ 35, 51, 52. Plaintiffs also assert that the success of the SCP Products was in part due to their "considerable efforts," which included research, promotion of the products through publication of scientific articles and frequent lectures, and Plaintiffs' efforts in expanding the application of the SCP technology to joints other than the knee. *Id.* ¶¶ 34, 36.

This changed in late 2016, when Zimmer "and, at its direction, ZKC, began making major budget cuts in medical education and reduced sales commissions related to the [SCP] Products." *Id.* ¶ 58. Plaintiffs allege that after Zimmer retained a new President in 2017, Zimmer "unilaterally reduced the educational budget" for SCP Products' sales commissions "and virtually eliminated direct-to-consumer marketing" of these products. *Id.* ¶ 60. As a result, the Amended Complaint alleges that annual sales of SCP Products related to both the knee and other joints decreased. *Id.*[6]

---

[5] The Amended Complaint does not explain when ZKC retained the rights to the SCP technology, but alleges that "[P]laintffs understood that Zimmer had assigned all of its rights under the 2008 Agreement and the 2013 Agreement to ZKC." Am. Compl. ¶ 44.

[6] Defendants disagree with Plaintiffs' contention that a dramatic reduction of sales occurred at this time. *See* Motion to Dismiss at 5 (contending that "judicially noticeable public records . . . reveal that (i) Defendants' royalty payments to Plaintiffs barely changed between 2017 and 2018 (dropping from $1.94 million to $1.92 million), and (ii) Defendants' royalty payments to Plaintiffs

Plaintiffs attribute this sudden change in Zimmer's promotional efforts to a conflict between the SCP technology, which "has been shown both to delay the need for knee replacement and prevent knee replacement for some patients," and Zimmer's "consulting and royalty relationships with many knee replacement surgeons, who have objected to the promotion of SCP technology because it competes with joint replacements and diminishes royalties paid to those joint replacement surgeons." *Id.* ¶ 61.  Plaintiffs claim that in 2017, "in an effort to maximize its profits," Zimmer decided to change its business strategy by promoting "certain joint replacement products, eliminating other joint replacement products, and suppressing the sale of [the SCP] Products to the knowing and intentional detriment of [Plaintiffs]." *Id.* ¶ 62.  To affect this change, Zimmer "consolidated its manufacturing," "reduced the number of its employees," terminated its "Knee Creations division, which was responsible for the development and sale of [the SCP] Products as well as patient and surgeon education," and redirected its sales force to concentrate on joint replacement products over the SCP Products. *Id.* ¶¶ 62-63.

Thus, Plaintiffs allege, Zimmer "began suppressing" the sales of knee-related SCP Products and "the development of complimentary SCP technologies for the treatment of arthritis pain in other joints." *Id.* ¶¶ 63-65.  Plaintiffs also claim that Defendants have permitted "various third-parties," including Arthrex, to infringe on the SCP technology patents, and allowed another third-party, Anika Therapeutics, to utilize "trade secrets related to the sales and marketing of" the SCP Products. *Id.* ¶ 66.  Plaintiffs assert that all this conduct demonstrates that "Zimmer . . . and ZKC clearly have not used their best efforts to promote and sell the [SCP Products]." *Id.* ¶ 61.

---

were higher in 2019 than they were in any year prior (reaching $2.06 million)." (citing Payment Records for Peter Sharkey, Open Payments Data, https://openpaymentsdata.cms.gov/physician/98560; Payment Records for Charles Leinberry, Open Payments Data, https://openpaymentsdata.cms.gov/physician/229810)).

## B. Procedural Background

Plaintiffs commenced this action with the filing of the Complaint on October 5, 2020, Dkt. 1, and filed the Amended Complaint on November 13, 2020. Plaintiffs allege that Defendants breached the implied covenant of good faith and fair dealing contained in the 2008, 2013, and 2014 Agreements, by seeking to prevent performance of those agreements, frustrating their purpose, and/or withholding royalties owed to Plaintiffs. Am. Compl. ¶ 71. The Amended Complaint also pleads a claim of tortious interference with contract against Zimmer, asserting that Zimmer disrupted the contractual relationship between Plaintiffs and ZKC by, *inter alia*, terminating ZKC's employees and instructing it to focus on other products. *Id.* ¶ 75.

Defendants moved to dismiss Plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on December 22, 2020. Dkt. 30, Dkt. 31 ("Motion to Dismiss"). Plaintiffs filed their opposition on January 19, 2021, Dkt. 32 ("Opposition"), and Defendants submitted a reply in support of their motion on January 29, 2021, Dkt. 33.

## II. Applicable Legal Standards

### A. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must come forward with more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," and must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. While a plaintiff is not required to plead "detailed factual allegations," the complaint must still contain more than "an unadorned, the-defendant-unlawfully-

7

harmed-me accusation." *Iqbal*, 556 U.S. at 678. Ultimately, the court's task at this juncture is to determine whether the complaint includes "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Twombly*, 550 U.S. at 545.

For purposes of a Rule 12(b)(6) motion, the Court presumes as true all well-pleaded factual allegations contained in the complaint and "draw[s] all reasonable inferences in favor of the plaintiff." *Montero v. City of Yonkers*, 890 F.3d 386, 391 (2d Cir. 2018) (internal quotation marks and citation omitted). In addition to the allegations contained in the complaint, a court may consider documents attached as exhibits, incorporated by reference, or integral to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The tenet that a plaintiff's factual allegations are accorded a presumption of truth does not carry over to assertions contradicted by these documents. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995); *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

**B. Contract Interpretation under New York Law[7]**

"Under New York law, . . . a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." *In re MPM Silicones, L.L.C*, 874 F.3d 787, 795 (2d Cir. 2017). It is well settled "that where the language [in a contract] is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language." *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32 (2002) (quoting *Springsteen v. Samson*, 32 N.Y. 703, 706 (1865)). Similarly, the parties' intent must be gleaned from the provisions of the agreement, and "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." *Greenfield*

---

[7] As provided in the 2008 Agreement and unaltered by subsequent amendments, the parties agreed that the contract "shall be governed by and enforceable in accordance with the laws of the State of New York." 2008 Agreement ¶ 7.3. Moreover, both parties apply New York law in their briefs, and "such implied consent is . . . sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)).

*v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002); *see also W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.").

### III. Discussion

**A. Breach of the Implied Covenant of Good Faith and Fair Dealing**

Pursuant to New York law, "a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007). This covenant prohibits a party to a contract from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)). A breach of this implied covenant is "merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal quotation marks and citation omitted). To sufficiently plead "a breach of contract under a theory of breach of the implied covenant, a plaintiff must allege that defendant, in bad faith, engaged in behavior that effectually destroyed or injured the plaintiff's right to receive 'the fruits of the contract.'" *K&G Elec. Motor & Pump Corp. v. Ingersoll-Rand Co.*, No. 18 Civ. 2308 (DRH), 2019 WL 4089546, at *7 (E.D.N.Y. Aug. 27, 2019) (quoting *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 696 (S.D.N.Y. 2018)).

Courts have recognized that this doctrine "is not without limits," and that "no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Dalton*, 87 N.Y.2d at 389 (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983)); *accord Canon Inc v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 581 (S.D.N.Y. 2015) ("The implied covenant . . . cannot be used to 'imply an obligation inconsistent with other terms of a

9

contractual relationship.'" (quoting *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013))).  A plaintiff must instead allege that the defendant took action which "directly violate[d] an obligation that f[ell] within the[] reasonable expectations" of the parties. *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991).  The Second Circuit has also cautioned that "[t]he covenant will be breached only in a narrow range of cases," and that it may not be used to "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (internal quotation marks and citation omitted).  Rather, "[t]he doctrine is employed when necessary to 'effectuate the intentions of the parties, or to protect their reasonable expectations.'" *Gaia House Mezz LLC*, 720 F.3d at 93 (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).

Plaintiffs allege that Defendants' actions have "frustrate[d] the basic purpose" of the Amended Agreement and "sought to prevent performance of" that agreement by improperly withholding royalty payments from Plaintiffs.  Am. Compl. ¶ 71; *see id.* ¶ 64 (asserting that Zimmer "unilaterally began suppressing sales (and causing ZKC to suppress sales)" which resulted in a "significant decrease in [Plaintiffs'] royalty payments").  The Amended Complaint primarily alleges that Defendants intentionally reduced sales of SCP Products by refocusing their sales efforts on competing joint replacement products. *Id.* ¶¶ 60-65.  Plaintiffs also accuse Defendants of failing to safeguard SCP intellectual property and trade secrets related to promoting and selling the SCP Products. *Id.* ¶ 66.[8]

---

[8] While not entirely clear from this single paragraph allegation in the Amended Complaint, the Court assumes that Plaintiffs are alleging that Defendants also breached the covenant of good faith and fair dealing by not protecting their intellectual property and trade secrets, and therefore addresses that argument herein as well.

10

Defendants respond that they were at all relevant times acting within their contractual rights and that Plaintiffs' intellectual property allegations also must be dismissed as conclusory. *See* Motion to Dismiss at 6-10, 13-15. In opposing dismissal, Plaintiffs rely primarily on their contention that Defendants had an implied duty to exercise their "best efforts" to sell and promote the SCP Products. *See* Opposition at 3, 7-9.

### 1. Defendants Did Not Owe A Duty to Use Their "Best Efforts" to Promote and Sell the SCP Products

The Court first considers the threshold issue of whether the Amended Agreement required Defendants to use their "best efforts" to promote and sell the SCP Products. *See* Am. Compl. ¶ 61; Motion to Dismiss at 8-10; Opposition at 7. Both parties agree that the Amended Agreement contains no express provision placing such a duty on Defendants. Nonetheless, Plaintiffs argue that this obligation inheres in the contract as an implied covenant. Opposition at 7 ("There is little question that the Agreement . . . is of the type in which the law implies a covenant of good faith and fair dealing, including an obligation to use 'best efforts' to promote, market, and sell the products."). A duty arising from the implied covenant must be one which the parties could reasonably expect to arise from their contractual relationship. *See Bank of China*, 937 F.2d at 789. The Court's inquiry therefore begins with the contractual terms, which leads to the conclusion that imposing an obligation to use "best efforts" to promote, market, and sell the SCP Products would be inconsistent with the parties' intent and expectations in entering into the Amended Agreement.

The Court first notes that the 2008 Agreement specifically included a provision that requires Defendants to exercise their "best efforts" to achieve the "Milestone(s)":

> *Buyer shall use its commercially reasonable best efforts to achieve each of the specified events set forth in subsections (a) through (d) hereof* ("Milestone(s)") as promptly as commercially reasonable after the execution of this Agreement and shall make the following payments to the Sellers upon occurrence of each such Milestone.

2008 Agreement ¶ 3.1 (first emphasis added). But this "best efforts" obligation only concerned the *four milestones* specifically enumerated in the 2008 Agreement. None of these milestone events involved the promotion of SCP Products. *See id.* ¶ 3.1(a)-(d). Because a duty to use "best efforts" was specifically written into this section of the Agreement, the necessary inference is that the omission of a provision requiring Defendants to exercise the same "best efforts" as to promotion of the SCP Products was intentional. *See Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission."); *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 277 (2011) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." (internal quotation marks and citation omitted)); *Novella v. Westchester Cnty.*, 661 F.3d 128, 142 (2d Cir. 2011) (applying the textual canon of *expressio unius est exclusio alterius* to hold that "the presence of [a] provision applicable to one [portion of the contract] makes clear that the omission of that provision in [another section of the contract] . . . was deliberate").

The implied covenant may not be used to "supply additional terms for which the parties did not bargain." *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991 (S.D.N.Y. 1989); *see, e.g.*, *Gaia House Mezz LLC*, 720 F.3d at 93 ("The covenant cannot be used . . . to imply an obligation inconsistent with other terms of a contractual relationship."); *M/A-COM Sec. Corp.*, 904 F.2d at 136 ("Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties."); *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 751-52 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 57 (2d Cir. 2017); *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, No. 97 Civ. 4914 (SS), 1997 WL 685334, at *6 (S.D.N.Y. Nov. 4, 1997) (Sotomayor, J.) ("The

duty of good faith cannot add to, detract from, or alter the terms of the contract itself."), *aff'd*, 149 F.3d 134 (2d Cir. 1998).  Here, a "best efforts" requirement was included for achieving the milestones, but not for promoting and selling the SCP Products.  In light of the parties' deliberate omission of such an obligation in connection with the promotion and sales, the Court will not on its own impose one.

Further support for this conclusion comes from the express terms of the 2013 Amendment.  In that amendment, the parties agreed to "delete[], extinguish[], and remove[]" Section 4.2(f) of the 2008 Agreement, which would have otherwise forbidden Defendants from "directly or indirectly engag[ing] in research, development or marketing of any product competitive with the [SCP technology]." 2013 Amendment ¶ 1(c); 2008 Agreement ¶ 4.2(f).  Plaintiffs assert that the contract nonetheless required Defendants to exercise "best efforts" to promote the SCP Products and Defendants breached this obligation by focusing on competing joint replacement products.  Am. Compl. ¶ 61.  But Plaintiffs clearly bargained away the right to object to actions by Defendants in developing or marketing competitive products when they signed the 2013 Amendment.  Plaintiffs' interpretation of the Amended Agreement as containing this implied obligation would necessitate reading Section 1(c) out of the 2013 Amendment, which the Court will not do.  *See Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183 (2d Cir. 2019) (discussing the "well-settled principle" that a contract must be read to "give[] a reasonable, lawful, and effective meaning to all [of its] terms" (quoting Restatement (Second) of Contracts § 203)).[9]

---

[9] Plaintiffs argue that this amendment had no effect on the contract because Zimmer "was still obligated to comply with its other obligations under the 2008 Agreement, which included the implied 'best efforts' obligation." Opposition at 10 (emphasis removed).  But as discussed, no "best efforts" obligation extended to the promotion and sale of the SCP Products and, regardless, reading the 2008 Agreement in such a manner would render Section 4.2(f) of that agreement superfluous.

Plaintiffs also rely on a line of cases involving licensing agreements where courts have imposed an implied "best efforts" obligation on a defendant to exploit the license. *See* Opposition at 7-10. As a general rule, courts refuse to imply a "best efforts" obligation when one is not expressly contained in the contract. *See CCM Rochester, Inc. v. Federated Invs., Inc.*, No. 14 Civ. 3600 (VEC), 2014 WL 6674480, at *6 (S.D.N.Y. Nov. 25, 2014); *Washington v. Kellwood Co.*, No. 05 Civ. 10034 (MHD), 2015 WL 6437456, at *26 n.35 (S.D.N.Y. Oct. 14, 2015) (noting that "in New York, a 'best efforts' clause requires an explicit term in the Agreement"); *Liu v. Beth Israel Med. Ctr.*, No. 02 Civ. 2034 (DLC), 2003 WL 21488081, at *3-4 (S.D.N.Y. June 26, 2003); *see also Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1576 (2d Cir. 1994) ("In the absence of an explicit 'best efforts' clause or specific promotional obligation, courts are properly reluctant to award lost profit damages for a failure to adequately promote a product where a party's discretionary decisions are exercised pursuant to good faith business judgment."). Some courts, however, have applied the reasoning of *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917)—a case in which the New York Court of Appeals read in an implied reasonable efforts obligation to avoid finding a contract unenforceable for lack of consideration—to imply a similar duty in the context of licensing agreements containing an obligation to pay royalty fees. *See New Paradigm Software Corp. v. New Era of Networks, Inc.*, No. 99 Civ. 12409 (RMB) (AJP), 2002 WL 31749396 at *11-12 (S.D.N.Y. Dec. 9, 2002) (collecting cases); *Morris v. Putnam Berkley, Inc.*, 687 N.Y.S.2d 139, 140 (App. Div. 1999).

These cases, however, are inapplicable to the present dispute. As the court in *Wood* emphasized, the relevant inquiry must focus on "determining the intention of the parties." 222 N.Y. at 92. Here, the express terms of the relevant contracts demonstrated an intent to disclaim the implied duty Plaintiffs seek to impose. The New York Court of Appeals has continued to reaffirm the principle that an obligation stemming from an implied covenant must be one "which

a reasonable person in the position of the promisee would be justified in understanding w[as] included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978) (internal quotation marks and citation omitted); *see Caceci v. Di Canio Constr. Corp.*, 72 N.Y.2d 52, 60 (1988) (citing *Wood* for the proposition that "courts will imply a covenant of good faith where the implied terms *are consistent with other mutually agreed upon terms*" (emphasis added)); *Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57, 60-61 (2d Cir. 2017).[10]

For the above reasons, no reasonable person standing in Plaintiffs' shoes would be justified in thinking that a "best efforts" obligation inhered in the Amended Agreement.

### 2. Plaintiffs Fail to Adequately Plead a Breach of the Implied Covenant

Having determined that there was no implied duty on Defendants to apply their "best efforts" to promote and market the SCP Products, the Court next turns to whether the factual allegations in the Amended Complaint sufficiently support a claim for a breach of the implied covenant of good faith and fair dealing. The Court concludes that they do not.

---

[10] This Court also notes that the specific issue before the court in *Wood* was whether the relevant contract was void for lack of consideration. 222 N.Y. at 90-91. The contract before the court lacked any express obligations, unrelated to the payment of royalties, binding the plaintiff. To find the contract enforceable, the court read in an implied "reasonable efforts" duty on the plaintiff. *Id.* at 91-92. Courts applying *Wood* have split on whether its reasoning still applies if there are obligations on the defendant other than the payment of royalty fees. *See Palazzetti Imp./Exp., Inc. v. Morson*, No. 98 Civ. 722 (FM), 2001 WL 1568317, at *6-7 (S.D.N.Y. Dec. 6, 2001) (discussing the split of authorities), *aff'd*, 54 F. App'x 698 (2d Cir. 2002); *New Paradigm Software Corp.*, 2002 WL 31749396, at *11-14 (reviewing case law and stating that "the law in New York" on this issue "is far from clear"); *Automated Irrigation Controls, LLC v. Watt Stopper, Inc.*, 407 F. Supp. 3d 274, 290 (S.D.N.Y. 2019). Under the 2008 Agreement, Plaintiffs received $100,000 in consideration and were entitled to various milestone payments. While the Court need not decide whether these forms of consideration separate from the royalty payments are dispositive as to Plaintiffs' implied covenant claim, these provisions nonetheless further caution against applying *Wood* to read a non-existent "best efforts" obligation into the Amended Agreement. *See Automated Irrigation Controls, LLC*, 407 F. Supp. at 290 ("Courts have been reluctant to imply a duty to use reasonable promotional efforts into contracts granting exclusive licenses when the agreement at issue provides for a substantial upfront payment or the payment of guaranteed royalties.").

No obligation in the Amended Agreement, implied or express, prohibited Defendants from changing course and focusing on a different segment of their business.  The Second Circuit has instructed that "the implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract."  *M/A-COM Sec. Corp.*, 904 F.2d at 136 (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46 (1972)).  Defendants, "in an effort to maximize . . . profits," Am. Compl. ¶ 62, acted in their self-interest in redirecting resources to promote joint replacement products over the SCP Products.  And far from precluding Defendants from focusing on promoting items other than the SCP Products, the history of the Amended Agreement leaves no doubt that such a business strategy was not only allowed but fully understood by the parties.  As previously noted, the 2013 Amendment removed the provision that would have contractually prohibited Defendants from taking these actions.  While Defendants' conduct may have been detrimental to Plaintiffs, they may not now imply an obligation which they expressly bargained away in the 2013 Amendment.

For similar reasons, Plaintiffs' allegations that Defendants failed to protect SCP-related intellectual property and trade secrets are insufficient to support a breach of an implied covenant. "A plausible claim that [the defendant] acted in bad faith in order to deprive [the plaintiff] of the benefit of its bargain should logically include some reference to the parties' bargain.  Bad faith conduct is not considered in a vacuum, but rather, in the context of the parties' intentions and expectations, as memorialized in the contract."  *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 472 (S.D.N.Y. 2013), *adhered to on denial of reconsideration*, 2013 WL 6182949, *aff'd*, 788 F.3d 98 (2d Cir. 2015).  Under the 2013 Amendment, the parties expressly agreed to remove a provision that would have required Defendants to "take . . . commercially reasonable actions to maintain and protect" the SCP intellectual property. 2013 Amendment ¶ 1(c); 2008

Agreement ¶ 4.2(a). Because "it is the 'intent and reasonable expectations' of parties entering into a given contract that fix the boundaries of the covenant of good faith and fair dealing," *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (quoting *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989)), this conduct falls outside the purview of the implied covenant.

And even assuming *arguendo* that there was such an implied obligation, Plaintiffs' factual allegations would still be insufficient. "[S]tating a claim based on a breach of the implied covenant of good faith requires some showing of intent to harm the other contracting party or a reckless disregard of it." *In re Libor-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Sec. Plans, Inc.*, 769 F.3d at 817 ("Negligence in operating a business, as we have explained, is insufficient to support a claim under the implied covenant."). Plaintiffs allege that Defendants "permitted various third parties" to infringe on SCP-related technology and trade secrets. Am. Compl. ¶ 66. Yet these allegations do not reflect that Defendants acted intentionally, in bad faith, or with reckless disregard as to sharing this proprietary information.

Lastly, the Amended Complaint repeatedly alleges that Defendants have knowingly and intentionally "suppressed" the sales of SCP Products. Am. Compl. ¶¶ 1, 11, 62, 64, 65, 67. In response to Defendants' argument that these allegations are too conclusory to withstand a motion to dismiss, Plaintiffs argue that the Amended Complaint pleads "at least one way in which such suppression has occurred, namely, the closing of the Knee Creations division, elimination of direct-to-consumer marketing, and directing of sales force to focus on products other than [the] SCP Products." Opposition at 16. But as already mentioned, Defendants acted within their contractual rights when they engaged in this conduct. Because Plaintiffs allege no additional facts

supporting this purported "suppression," Plaintiffs' implied covenant claim may not survive based on these conclusory assertions.

Accordingly, the Court grants Defendants' Motion to Dismiss as to Plaintiffs' breach of the implied covenant of good faith and fair dealing claim.

### B. Tortious Interference with Contract Claim

A claim of tortious interference with contract under New York law "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). "In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party." *Jack L. Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 1080 (1977). And as noted above, a claim for a breach of the implied covenant of good faith and fair dealing "is part of a general breach of contract claim." *Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211, 223 (S.D.N.Y. 2010), *aff'd*, 453 F. App'x 108 (2d Cir. 2012).

Plaintiffs do not argue that Defendants breached an express term of the Amended Agreement and, as discussed, the Amended Complaint fails to adequately allege a breach of the implied covenant. The Court therefore dismisses Plaintiffs' tortious interference with contract claim.

### C. Leave to Amend

Plaintiffs seek leave to replead if Defendants' motion is granted. *See* Opposition at 19. "In general, a court should grant leave to replead unless doing so would be futile." *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 4 (S.D.N.Y. 2020). Plaintiffs had an opportunity to cure the deficiencies in their pleadings after Defendants filed a pre-motion

18

conference letter on October 27, 2020, outlining the same grounds of dismissal as underlying the instant motion.  *See* Dkt. 13.  Plaintiffs filed the Amended Complaint on November 13, 2020, yet failed to remedy those defects.  Further, Plaintiffs have not "suggested" that they are "in possession of facts that would cure the deficiencies identified in this opinion."  *Greifman v. Client Servs., Inc.*, No. 20 Civ. 1781 (CS), 2021 WL 1828076, at *9 (S.D.N.Y. May 7, 2021).  To the contrary, Plaintiffs have conceded in their brief that "[a]ny additional facts supporting the active suppression of SCP [P]roducts would be in Defendants' sole control."  Opposition at 16.  Moreover, Plaintiffs' claims are dismissed on substantive grounds, rather than for lack of specificity.  The Court therefore finds that granting leave to replead under these circumstances would be futile and denies Plaintiffs' request.

### III.  Conclusion

For the reasons described above, the Court grants Defendants' Motion to Dismiss with prejudice as to both of Plaintiffs' claims.  The Clerk of Court is respectfully directed to terminate the motion pending on Docket Number 30 and close this case.

SO ORDERED.

Dated: August 9, 2021
       New York, New York                       _____
                                                JOHN P. CRONAN
                                                United States District Judge